If you are ready, the next case is number 2012-3049 McDaniel v. DHS You may leave the court. I represent Petitioner Lester McDaniel. There are two separate issues really for this court to decide today. Whether the agency denied Mr. McDaniel due process and whether the board erred in sustaining the administrative judge's initial decision because neither of the agency's charges are supported by substantial evidence. I'd like to lead with a due process argument. An agency violates an employee's due process rights by denying him notice and opportunity of the agency's proposal of adverse action and the specific information considered so that he has an opportunity to respond. In this case, which falls squarely on all fours with the Solis case, which is brief, Mr. McDaniel was never advised that the Giglio taint, which was clearly part of the deciding official's calculus in deciding to remove Mr. McDaniel, was never disclosed to him. It was not in the proposal letter. It was not in the decision letter. It was not raised or removed. But you can see that he was on notice, that the concern was about his trustworthiness, his continued ability to serve as a law enforcement officer, and that the concept of his believability and credibility was encompassed within those original letters, correct? I believe, Your Honor, that the issue of trustworthiness and integrity came up. Integrity is a much broader concept. Giglio, I think. Giglio. Giglio. Giglio. Giglio. Right. Not the reference to the Van Ackland movie. Giglio is, in fact, a very specific universe within the law enforcement community. And, truthfully, Giglio does not automatically preclude an employee, a law enforcement officer, from serving as a law enforcement officer. But, given the job that he had, his need to testify is given. I mean, there's no way you can do the job and not be regularly available for testimony. I don't agree with that, Your Honor, because there are plenty of law enforcement officers in the universe of federal law enforcement that are Giglio-tainted, but do not testify, do not conduct search warrants, do not arrest people. But, in his job, he regularly testifies, correct? I don't know that the record is clear on that, Your Honor. We have to look at the bare record, because all we know is what he was assigned to. At one point, he was assigned to the Internet Crimes Against Children Task Force. On another, he was assigned to the North County Regional Gang Task Force. Some of these are intelligence gaps. But a Giglio-taint is not really a separate charge. It just flows as a matter of course from lack of integrity, lack of credibility, lack of trustworthiness, right? That is correct. A Giglio-taint is not, in and of itself, a separate or special charge, but it is a consequence of one of the charges. And the fact that the deciding official considered this consequence without ever telling the appellant, Mr. Daniel, that he was going to consider it, that it was important to him, that it made a difference in his decision without giving us an opportunity to address the fact that even if he was Giglio-tainted, that he would still be employable by the agency. This is a removal action. What is the prejudice, though? I mean, is it given that he's Giglio-tainted? The prejudice is due process. No, no. Due process violations only give rise to relief when there's prejudice. This was raised in the decision, in the O'Keefe decision, which is essentially he has to have an opportunity to respond to all of the universe of things that are in the deciding official's mind. Again, what's the prejudice? So the prejudice is that he didn't have an opportunity to talk to, to address the issue. What would his response have been? I think we have to look at the bare record, okay? He can't say he's not Giglio-tainted. Well, he could, but the agency doesn't Giglio-taint. The U.S. Attorney's Office, the prosecuting agency, would Giglio-taint. So the agency's position... I do doubt in the Ninth Circuit, at least, this would be evidence that, I guess, what's the name of the case, Herson? Is that Henson? It is the case. The Ninth Circuit basically said this kind of evidence is going to come out every time you testify in a federal court. So why not then give him notice of it so he has an opportunity to respond to it? Why not tell him, because of a lack of... So what's his response, though? I mean, if they say, well, all right, we have a problem here with credibility, and one of the manifestations of that credibility problem is that it may make you potentially unavailable as a witness in a federal case, why isn't... What is he going to say with respect to that? Because it wasn't just that it was a Giglio-taint. It was the consequence of the Giglio-taint that essentially led to his removal. That's what the deciding official had in his mind. Well, it was one of many of the Douglas factors. That was one of the Douglas factors, but he constantly referred to trustworthiness and that was one of the Douglas factors that he decided for. You're not denying that he knew all about the concerns about trustworthiness and integrity. Correct. What you're just saying is that he didn't focus on or wasn't told about this consequence of a lack of trustworthiness. Which is the heart of the matter. The consequence is the Giglio-taint, which led to the removal, or at least was an important factor. I was going to say, there were a lot of other consequences. Like, I can't trust you as a law enforcement officer to work for us. But that's not what he said. He did say that. Well, he said that in part, but he also mentioned the Giglio-taint. Again, what is his response? So the response is that the Giglio-taint alone does not support removal. There are plenty of other positions within the law enforcement community that do not require testimony. For example, within the marshal service. Well, there are two elements to his problem, it seems to me, and I suspect under Ninth Circuit law, both of them will have to be revealed. One of them is that he has been arrested. And the other is, he didn't tell the truth about that on the forum. So, as a witness, he's doubly impaired, it seems to me. If I am a defense lawyer, I would love to have the record in this case to play with if I had this witness on the stand. Wouldn't you? You would use this, wouldn't you? Wouldn't you use the fact that you say, do you always tell the truth? Have you always told the truth? Did you tell the truth in 2006? Well, I think that gets to the two substantive issues, which are the knowingly making a false statement on an official forum, and the lack of candor. He had a sincerely held, but ultimately incorrect, belief that he was not arrested the night that he got his DUI. And he maintained that from day one. He was wrong about it. He's admitted he was wrong about it. But he had that sincerely held belief. You say he maintained that from day one. Didn't he initially say, yes, I was arrested? No, he never said he was arrested. Not until after they told him. Correct. Until after they told him. Until after the 2008 San Diego County Sheriff's Department application when it was revealed that he wrote no to the question. Well, wait a minute. Wait a minute. Maybe I'm mistaken about this. Maybe I misread this. Correct me if I have. But I thought that on November 12, 2004, he signed an affidavit in which he did admit that he was arrested. I would like to address that. Well, but before we address it, let's see if I'm right or not about that. Did he make such a statement? The November 2004 investigation affidavit, which he did not prepare, which was prepared for him, the paragraph that you're referencing, according to information received by OPR slash SD on June 8, 2004, you were arrested by the San Diego Police Department while driving under the influence of alcohol. Correct. So in other words, and he said yes, he could not answer no to that because he was driving under the influence. It's a question that essentially assumes facts, not an evidence. In other words, if this was before a trial court or even in a deposition, I would have objected to that question because it's compound. There are two questions in there. Were you arrested? Were you driving under the influence? He was certainly driving under the influence. He never denied that. But that certainly puts him on notice. When you're talking about his good faith belief, it puts him on notice that, in fact, he was arrested. There are a number of items that put him on notice, but they are not contemporaneous as the Department of Justice contends. I thought your argument was, in his initial application, he had a good faith belief that this wasn't an arrest. Correct. But soon, the next time the issue came up, he realized that he had been arrested. That is correct. So what happens is, all of this occurs in 2004. The arrest, the affidavit, the conviction. The next thing is the letter of caution in 2006, which also references the word arrest. 2008, four years after his arrest, after his conviction, is when this form comes up. And in his mind, remember he's a federal law enforcement officer, there's a distinction between federal law enforcement officers and local law enforcement. That doesn't mean they don't understand how the law works. That doesn't mean that they understand that a cite and release is an arrest. The issue is, he wasn't just cited. I mean, this is a case where somebody was, this isn't a Terry stop. I think we can agree with that, right? Do you understand the distinction between Terry and full traditional arrest? At some point, the Terry stop converted to a full arrest. Right. The Terry stop is typically 20 minutes. If you go beyond, I think the Supreme Court cases tell you 90 minutes, it's no longer a Terry stop, right? It's a totality test, yes. Right. But one of the principal elements of totality is, are you really in custody? And has the detention lasted for more than 20 minutes, 40 minutes? Those are the kinds of numbers that show up in Terry cases, right? Such that a reasonable person would not believe that they are free to leave. Well, even in Terry you're not free to leave, but you're certainly not detained for an extended period of time, i.e. more than an hour. He was detained for a number of hours. He was handcuffed, he was put in the police car, he was taken downtown. These are traditional facts of an arrest, which any federal law enforcement officer learns on the first day of law enforcement school. What is an arrest? And when you can do, for example, non-Miranda questioning, is all part of the grist of what federal agents learned. And I think the administrative judge certainly took all of that into account and said, and certainly the agency said, we don't believe him that he had to be free to leave. Right, and that's where I want to go right now. Because even if we were the administrative judges and we thought, well, you know, maybe he didn't really get it, maybe he really thought he wasn't arrested, maybe all this stuff slid past him, how do you get past the fact that the administrative judge made credibility determinations and said that it was not believable? We can't set aside those credibility determinations. Isn't that the end of the inquiry? It's a fair question, but it's not. Because under the Nagel case, and I think I'm articulating that correctly, there are two elements. One, that it was in fact a false or untruthful statement. And second, that it was made with the intent to defraud the agency. In order to sustain the knowingly making a false statement charge, you have to have those two elements. And there's no record evidence. The judge didn't review the evidence on that. The board did not make a finding on that. There's no record evidence that he intended to defraud the agency. And, which agency is he intending to defraud? He's not defrauding his own agency, because it's a San Diego County Sheriff's Department form. So, does the government even have standing? And I'm using that word loosely because it's not a true standing issue. But who is he attempting to defraud? And there's no record evidence that there was any intent to defraud. You know, we have a recent case, Leatherberry. Are you familiar with Leatherberry? Yes, sir. Which spells out the component requirements of intent to defraud, and says that in order to prove that element, it is sufficient if the employee either knew that the submission included a false statement of material fact, or was reckless with regard to ascertaining the truth of that statement. Now, that seems to me a hard argument to make to say that there wasn't at least recklessness here on his part, particularly given the findings made by the administered judge, don't you think? But I agree that in Leatherberry, just as in this case here, this is not fraud. This was a one-time mistake, which he was consistent about. And once he was really, once his eyes opened up, or had his eyes opened up that it was an arrest, he said, okay, I get it now, it's an arrest. And that's why he answered candidly on the second form, right? Because they handed him a second form for the county gang task force, and on that he answered yes. So once his eyes were opened, and we can argue all the time about whether or not he was bearing his head in the sand about this, whether it was sincerely held or not, certainly he was wrong, and he acknowledges that he was wrong. Because the bearing of his head in the sand is a definition, is one of the definitions of recklessness, of course, but not fraud. Well, but what the, you say not fraud, it is the employee intended to deceive or mislead the agency, and that is, under Leatherberry, can be proved by proof of reckless disregard of the truth of the situation, as opposed to actual affirmative knowledge, right? I agree, you know the passage I'm talking about. I agree that that's what Leatherberry says. I don't think it rises, what Mr. McDaniel did in this case, rises to that level. I don't think he was reckless, I think he was careless, but it was never an intent to harm anybody or to fraud the agency, as to his belief. And in fact, he was candid with OPR investigators when they asked him about it. They never believed him, but in fact, that's what he maintained throughout, until he was told affirmatively, for the first time told affirmatively, that you were, in fact, reckless. But it was the conviction that he was focused on, as you might imagine, a law enforcement officer is going to be more concerned with a conviction, than he's going to be with an arrest. Okay, let's hear from the other side. Ms. Vanderman, what is your name? May it please the court. The thrust of Mr. McDaniel's arguments are this alleged lack of substantial evidence. However, there was overwhelming evidence that the administrative judge and the full board found that Mr. McDaniel's explanation that he didn't believe he was arrested was not plausible. This was based on his demeanor at the hearing, as well as a contemporary misdocument. Mr. McDaniel's position that he didn't understand that he was arrested was simply not plausible, not credible, and the administrative judge found there was overwhelming evidence to support what the agency did. The full board... Let's talk about the due process issue. He wasn't fired the first time when he put on the form that he had never been arrested. And the San Diego department called him on it and said, we don't want this guy because he has been arrested. And yet, federal law enforcement kept him on, right? With respect to the two points, Your Honor, first of all, we'd like to make sure that he weighed due process, never raised it, and the Stone decision was in 1999. So, he really has weighed that argument before this court. He could have raised it below, he never did. If the court wishes to consider it, with respect to the first form, nobody knew at the time that he gave a false answer on that first form. It was when the second form came in that the San Diego police noticed it and contacted ICE right away and basically said, this is really serious. The San Diego police rejected him the first time. It was because they looked at the form and said, that's not true, he has been arrested. They ran him and found out, right? I'm trying to remember if it was the first or the second. If it was the first... So, are you saying that when the first time he was proposed for a task force and he was rejected, that federal law enforcement didn't bother to find out why he was rejected? I'm not sure that's how it happened. But basically, as soon as it came to the attention of the federal law enforcement agency, as soon as the San Diego police brought it to their attention, they investigated it right away and realized that this showed an utter lack of integrity. And integrity, in terms of his argument that he was never on notice of this, it just is wrong. At appendix 94 in the proposal to remove the whole thrust of that second full paragraph, is that he lacked integrity. Integrity means someone is honest, truthful, fully forthcoming, can be trusted. And this second full paragraph that builds on the two charges basically says, this conduct is extremely serious, you have no integrity. Throughout his oral, as well as his written reply to the deciding official before the decision was made, Mr. and Ms. Daniel focused on his integrity. He said, you can't do this job without integrity. And the job entailed not just testifying in court, but as the San Diego Police Department in their papers said, and there was evidence in the record, he was to be working, partnering with other local law enforcement, working on task forces involving child pornography and gangs, working with informants, working with substantial sums of money. Basically, the proposing official and then the deciding official said, we can't trust you. As an employer, we can't trust you to be truthful. As a law enforcement officer, and reciting cases in our brief, they are held to a very high standard of honesty and integrity, whether it's because they have to testify in court or swear out warrants, in this case it would be state warrants. They have to interview and investigate people. There has to be this extreme level of trust that the employing agency has in law enforcement. Let me go back. You're saying it's not credible that he didn't know he was arrested. I'm having a hard time believing that it was credible that when he was rejected the first time by the San Diego Police Department, that his supervisors didn't understand why he was rejected. He was specifically rejected and told he was rejected because he said he wasn't arrested, but he had been arrested. At the moment in time when the federal agency first learned that the reason he was rejected was because he hadn't been truthful with respect to his answer from the arrest, that's when the agency investigated and began I believe it was the second time when they started another OPR investigation. So we're just supposed to assume that the federal agency never bothered to find out why their own employee was rejected the first time? I'm not sure he was rejected the first time. He was put on the initial child pornography task force. Actually, he was put on and later asked to move to the gang task force because he was not comfortable with the issues that... But his application was specifically rejected, was it not? I believe not, Your Honor. I think that it was the second time and I apologize if I'm not clear on that. But the important point is that the first time that the agency learned about it, they took action because Mr. Whiten, his supervisor, testified that had he known that... Whiten knew that Mr. McDaniel had been arrested but he didn't know that Mr. McDaniel lied on the form the first time. You're saying the first time the agency learned about it was when he told them? No, the first time the agency learned about it was when the San Diego Police Department told Mr. McDaniel's supervisors that Mr. McDaniel had lied on the form. And that was with respect to his application to the gang task force, right? The second task force, not the child pornography task force. He lied on the first form. He answered yes to that question on the second form. Right, but that's when San Diego, you say, contacted the federal agent and said, this fellow has lied and that, you say, is the first time that the federal agency got word that he had lied on his earlier form. Yes, at whatever point in time was the first time that they found out about it, they realized that he had lied and he was not trustworthy. Well, help me out. Let's assume the record is what I tell you it is because I think it is. He was rejected from his application to become a special deputy the first time. And the reason he was rejected is because it said no to the arrest on the form but they ran a background check and found out he'd been arrested. Now, there's nothing in the record that says his supervisors understood why he was rejected but you're expecting us to believe that they never bothered to find out why he was rejected? The evidence in the record, Your Honor, is that as soon as the supervisors were informed by the San Diego police that he had lied is when they realized why he was rejected and if it was the first, that's the chronology of it. And it was in part because they were informed by a separate law enforcement agency that they undertook the investigation and it was also so serious because there was no trust that he could be truthful as a federal agent in partnering with the local police. But the arrest, which would have actually constituted a gelio taint even before never bothered the federal agency? Not necessarily, Your Honor. There's no evidence in the record as to whether the simple arrest would have led to a gelio taint. It was the fact that he lied about it. There is no evidence in the record one way or the other. Well, that's the question of what the law is. I mean, it would have had to have been disclosed, right? It is gelio material. By definition, it has to be disclosed if you put him on the stand. You can't put a witness on the stand and not disclose the fact that he had a prior arrest. Well, the gelio focuses, I believe, more on whether a witness, a law enforcement agent, has been truthful or not. And that was at the heart of this case. Because in this case, there was some testimony about, well, would he have been disqualified just because of the arrest? And it's not clear whether that would have happened or not. So, from this record, it's not clear whether he would have been gelio tainted. Let me see if I understand. There's a little bit of lack of clarity, I think, in my mind, about the sequence of events. See if this accords with your understanding of the sequence of events. So, he applies for the San Diego task force, the joint task force on cyber crimes, which turns out to be child pornography. In the course of that application, he requests to be designated special deputy, cross-designation deputy. He is allowed to work on the task force, but he is denied deputy status. That's the point at which he says no, but San Diego discovers that he has a DUI conviction and they deny him special deputy status for that reason. Correct, so far? Is that your understanding? In July 2008, he signed the first application. He was on the task force. In March of 2009, he signed the second application. And within two weeks, the San Diego Police Department notified ICE. Well, but they're two different task forces, right? And they're two different applications. And the first application that he makes back at the time of the cyber crime task force, he writes no and San Diego discovers that he actually does have a DUI conviction. Right? Or the local entity, I think. I'm not sure that's correct because my chronology is it wasn't until after he signed the second one that they discovered it and immediately notified ICE. Discovered the false answer. Right, I'm saying the first time they discovered the DUI. Without regard to whether they noticed that he had denied it, they ran his record and they discovered a DUI and that's the reason I thought the record showed that he was not given a special deputy status in the first task force, correct? I apologize, I'm not sure that's what the evidence shows. He was on the task force. He never was called to testify in court so it never became an issue. And he worked on that task force. Yeah, he'd never been called to testify in court. He wasn't called during that... During the child pornography. Less than, it was about six or eight months he was on the child pornography task force. From all of this, I take that what actually happened is that after the second application where he said yes, that was when they checked. Yes, and then immediately notified ICE and ICE then immediately took action. But bottom line is ICE didn't know that he had given a false answer on the application to San Diego. Well, no, he said he didn't know it was false. I'm sorry? Yes, at that stage. He said he didn't know it was false. He thought that what had happened was not an arrest. That goes with the substantial evidence argument, Your Honor, and it's just not plausible. No, I'm not asking about substantial evidence, I'm asking about the sequence of events. Mr. McDaniel said... After he gave the answer saying yes, he'd been arrested, he was confronted with his prior statement that he had not been arrested. That's right. And that was when I gather there was the first time or the first opportunity for him to say he didn't understand that that was an arrest, that he made a mistake. He said that he understands it now, at the time that he was questioned, but that at the time of the first application he didn't understand that that was an arrest. Yes, he maintained from that point forward for several years through the MSPB proceedings that he believed he was not arrested, simply detained. And that's what the administrative judge and the full board found was not plausible given the administrative judge's demeanor-based findings and the contemporaneous documents about the circumstances of his arrest, being handcuffed and placed in a patrol car and taken downtown and mug shot and his badge and weapon taken away. And he did sign in November 2004, Your Honor, in response to your question at Appendix 153, have you ever been arrested? He said yes, however. And then he submitted a three-page narrative of what he thought had happened. So his argument now that he could not have answered no to that question is also not plausible. He signed that statement saying, yes, I was arrested, however, and then went on to try to explain things and submitted a single-page, three-page narrative statement that starts at Appendix 153. So he, with respect to intent, his position taken for several years from the very beginning through what he said after the proposal, what he said to the deciding official about his integrity throughout the board proceedings that he didn't believe he was arrested is just not plausible. And that his answer, no, I've never been arrested, is just really displays a reckless disregard for the truth. But the arrest itself was irrelevant to the government's willingness to have him continue as a law enforcement agent, correct? That's, it's not clear totally in the record, but that seems to be the case, Your Honor, because there was no evidence about whether the arrest per se would have disqualified him. It was the fact that he... Well, it didn't. I mean, it was on his OPM form. They knew about it. It was the fact that he signed falsely to that answer, have you ever been arrested, and said no. And then during the OPR investigation, when the OPR... It was really when the San Diego Police Department embarrassed the federal government because they said, we wouldn't put somebody on as a special deputy who'd been arrested, but you guys keep this guy on, right? Well, the San Diego basically said he, they were concerned because he, not only the arrest, but he lied about it. It's a false statement. And then ultimately, the lack of candor that Mr. McDaniels showed during the OPR investigation when he was sworn to tell the truth and still, you know, said, I don't believe I was arrested. Nobody found that to be a plausible explanation given the facts and circumstances of the DUI arrest in 2004. Any more questions? Thank you. Mr. Jacobson. Thank you. I do want to address the chronology question. Joint appendix, page 8260, indicates that Chuck Arnold, who was the task force commander of the Internet Crimes Against Children task force, called Mr. Maurice Wright, who was Mr. McDaniels' group supervisor, and told him that Mr. McDaniels had not passed the vetting process. That's right there on page 8260 lines 15 through 25. There is some further discussion... He was, as I understand it, put on the task force, but he just wasn't designated a special deputy, is that correct? Correct. He stayed on the task force. Right, and only for a few months. Correct. And he was then considered for the gang task force. Correct. Is there anything to indicate that the failure to qualify him as a special deputy in connection with the first task force, the cyber crimes task force, was due to the false statement as opposed to the conviction? The only record that I could find while we were dealing with this issue, A273 of the Joint Appendix talks about the information that Mr. William Dryden received, talks about, as far as he knows, that Mr. McDaniels did not pass vetting because of the DUI. But the San Diego County Sheriff had to be aware of the fact that he had a conviction and said no on the form. And I wanted to address very quickly the Leatherberry question because one of the things that was addressed in Leatherberry is that the agency must show the employee acted with the requisite intent but cases from the circuit talk about intent requiring two distinct showings. First, that the employee intended to deceive or mislead the agency and second, that the employee intended to defraud the agency for his own private material gain. And that's Leatherberry citing the Bradley case that's at, the print site is page 1300 just before page 1301. So, in other words, even if you find in the Leatherberry that he was reckless and showed a reckless disregard for the truth of his arrest you still can't reach that second element because there was no private material gain. He was simply trying to get a key card to get into that meeting, the Monday meeting for the ITAC task force. There was no private material gain here. There was no material gain whatsoever especially because he remained on the task force even after he didn't pass vetting. And I think Judge O'Malley's point is well taken that the only reason this came up is because the San Diego County Sheriff's Department became embarrassed that there was an agent on their task force that they wouldn't have on their task force but that the agency allowed him on and that's why they raised this issue. And then the agency used the two different forms to say, ah-ha, gotcha, it's a false statement and you lack tandem. When in fact, they allowed him to be on the task force and continue as an employee long after he made this so-called false statement. Any more questions? Thank you, Mr. Jacobson and Ms. Vanderman. Thank you.